19702

Claude M. EPPS et al., Appellant v. William H. FREEMAN et al., Respondents.

(200 S. E. (2d) 235)

*Messrs. Claude M. Epps, Jr.* and *Howell V. Bellamy, Jr.,* of Myrtle Beach, and *H. T. Abbott,* of Conway, *for Appellants.*

*Messrs. J. Reuben Long* and *John C. Thompson,* of Conway, and *James P. Stevens* of Loris, *for Respondents.*

October 10, 1973.

Brailsford, Justice:

In 1945, J. E. Bryan and H. G. Cushman, under whom plaintiffs claim as heirs or devisees, subdivided a tract of land at Myrtle Beach, South Carolina, lying between U. S. Highway No. 17, also known as The Kings Highway, on the northwest and the Atlantic Ocean on the southeast. The

subdivision plat, dated June, 1945, was duly recorded in the office of the Clerk of Court, and all of the deeds out of the grantors contained identical building restrictions appropriate to a residential development. The seaward subdivision line is approximately seventy-five feet northwest of the "High Tide Line" of the Atlantic Ocean. Although it is not so marked or designated on the plat, the intervening beach area was, by the inauguration of the plan, the recordation of the plat and the sale of lots, dedicated to the lot owners and public for common enjoyment.

All of block 1 and lots 3-7 of block 2 extend from Ocean Boulevard on the northwest to the dedicated beach area. However, lots 1 and 2 of block 2 and all of blocks 3, 4 and 5, each of which includes four lots, are separated from the seaward boundary of the subdivision by Withers Swash, an irregularly shaped arm of the sea. The southern terminus of the Swash is in block 2 at the northern sideline of lot 3. On the north, the Swash extends beyond the subdivision. At some points the map depicts the Swash as slightly overlapping or contiguous to the seaward lot lines. For the most part, however, the map shows some fastland between the lot lines and the Swash, varying from about one hundred feet in block 5, where the Swash is at its narrowest, to a very narrow strip in blocks 2 and 3. The map also shows a strip of such land averaging about fifty feet wide, between the Swash and the dedicated beach area.

All of the lots were sold within two years after the subdivision was opened in 1945. The fastland bordering Withers Swash was not sold, nor offered for sale, nor, with the exception of one 1965 incident,[1] was any claim thereto made by the subdividers or their successors until this action was commenced in March of 1968.

The plaintiffs claim under the subdividers by will or inheritance. The defendants, respectively, are the owners of lots 1 and 2 of block 2, and of the lots in blocks 3, 4 and 5 as shown on the subdivision plat. The complaint alleges that plaintiffs own and are in possession of the property lying between the seaward lines of defendants' lots, as shown on the plat, and the dedicated beach area. Alleging further that defendants claim some interest therein constituting a cloud on plaintiffs' title, the complaint seeks an adjudication that defendants have no such interest and quieting plaintiffs' title to the property claimed by them.

The defendants have no common interest in all of the lots, which at the commencement of the action were held in some ten separate and distinct ownerships. We disregard the obvious misjoinder of causes of action, which has been waived by the defendants, but which produced hopeless confusion in the trial below and contributes to the difficulty of review here.

Ten answers were filed. One of these has gone out of the case by settlement. With immaterial exceptions, the remaining nine raise identical defenses, to wit:

*First Defense*: General denial.

*Second Defense*: Title by adverse possession to the land in front of the lot or lots of the answering defendants.

*Third Defense*: Plaintiffs are estopped from claiming property in front of defendants' lots because lots were shown on plat as oceanfront lots, and were represented by sub-

---

[1] At that time a representative of the "heirs" made the claim to a lot owner in block 4, that the land in front of his property belonged to them.

dividers and their selling agent as oceanfront lots and were purchased by defendants and their predecessors as such.

*Fourth Defense*: Title by accretion.

*Fifth Defense*: Dedication to the defendants and to the public in general of all land between the defendants' lot lines and the Atlantic Ocean.

*Sixth Defense*: Defendants are entitled to benefit of reciprocal negative easements which would be violated by plaintiffs' development of property between defendants' lots and ocean.

A Seventh Defense was, in effect, stricken by trial judge and presents no issue on appeal.

On a former appeal, we held that defendants were entitled to a trial by jury of the issue of paramount title raised by their answers. *Bryan v. Freeman,* 253 S. C. 50, 168 S. E. (2d) 793 (1969). On this trial, the plaintiffs made appropriate motions to test the legal sufficiency of the evidence to raise a jury issue as to title in the defendants. With minor exceptions, these motions were overruled, and the judge submitted all issues to the jury, stating that the equitable issues were being submitted only for the guidance of the court.

The deliberations of the jury resulted initially in a verdict on the back of the complaint "for the defendants." Verdicts were also returned on the back of each answer. Most of these were "for the defendant" or "defendants," as the case might be, but some were "for the plaintiffs." The court refused to accept the verdict written on the complaint, telling the jurors that this verdict would have been appropriate only if they had found in favor of all of the defendants, which they had not done as shown by the verdicts for plaintiffs on some of the answers. As directed by the court, the foreman of the jury voided the verdict on the complaint, and only the verdicts on the various answers were published.

After inconsistencies in these verdicts were pointed out and corrected, leaving a verdict in favor of plaintiffs only

as to the defendant M. N. Carroll, the other verdicts being for the defendants, the court took under advisement plaintiffs' motion for judgment notwithstanding the verdicts or for a new trial as to the other defendants, and like motions by the defendant Carroll.

In passing upon these motions, the court reversed its trial ruling that the general verdict for the defendants, endorsed upon the complaint, must yield to the inconsistent verdicts for plaintiffs which were endorsed upon the answers of certain defendants. In so doing, the court ruled that the denials contained in the answers placed plaintiffs' claim of title in issue, and that the general verdict for defendants decided this issue against plaintiffs. The court also resolved all other issues, both legal and equitable, in favor of the defendants, including the defendant Carroll.

The plaintiffs have appealed on 132 exceptions which they argue in a brief of 176 pages under forty-seven main headings. The tediousness of the record and briefs is partly accounted for by the parties' attempts to present separately the multiple causes of action jumbled in plaintiffs' complaint. Hopefully, the appeal can be disposed of without our backtracking this course.

It was clearly error for the court to undertake to reinstate as the verdict of the jury on the issue of plaintiffs' proof of title, the general verdict for the defendants because—if for no other reason—this verdict was not received by the court at the trial as that of the jury. *Kneece v. Hall,* 138 S. C. 157, 135 S. E. 881 (1925).

Conceiving that the evidence in favor of the defendant Carroll on the issue of adverse possession and on that of accretion was equally as strong as that in favor of two other defendants whose identical claims had been sustained by the jury, the court granted judgment notwithstanding the verdict to Carroll on these issues. Again the error is clear. The inconsistency in the verdicts was ground for a new trial, but not for judgment *non obstante veredicto.*

These errors will require a new trial if, but only if, the evidence was sufficient to raise an issue or issues for the jury on the defendants' pleas of paramount title, as to which alone the defendants were entitled to trial by jury.

The statement of the case quite clearly concedes that plaintiffs and defendants claim from a common source and that deeds in evidence to the subdividers included the lands shown on the 1945 subdivision plat, by which the defendants purchased their respective lots according to lot and block number and by which the parcels of land claimed by plaintiffs are described. Hence, the only issues for jury trial raised by the pleadings were the defendants' claims of title by adverse possession and by accretion. Except as affected by these defenses, we need not examine the sufficiency of the proof of plaintiffs' title to the fastland bordering Withers Swash in blocks 2-5, inclusive, of the subdivision. No distinct issue is raised as to title to the bed of the Swash, to the decision of which the State would be a necessary party.

It is conceded that prior to the construction of a USO building at Myrtle Beach in the early 1940's Withers Swash was an arm of the sea in which the tide ebbed and flowed. The mouth of the Swash was some distance north of 10th Avenue,[2] the northeastern boundary of the subdivision. From it the Swash extended both north and south, roughly parallel with the shore. With the construction of the USO building, a bulkhead was built in the Swash at a point south of the mouth and north of 10th Avenue. This effectively blocked the ebb and flow of the tide south of the bulkhead, and created what is referred to in the record as a dead swash. However, the channel through which the tide formerly ebbed and flowed was from time to time filled by the waters of unusually high tides, which were trapped there by the bulkhead. The testimony indicates that when the

---

[2] In Myrtle Beach cross streets between The Kings Highway and Ocean Boulevard are numbered in sequence, and the subdivision map conformed to this plan.

plat was made and the lots sold, the Swash area was essentially submerged land, and it was so represented on the plat. These waters were commonly resorted to for crab, fish, swimming and other recreation, particularly by children at play.

The defendants and their predecessors-in-title have from time to time, largely since the early 1960's, filled in the Swash area by pushing up sand from the beach and hauling in dirt and coquina. Grass and trees have been planted and other improvements installed. In recent years, the Swash area has thus been converted into highland and no part of it is now submerged. With minor exceptions, which will be adverted to below, the activities which wrought this conversion took place within five or six years of the commencement of the action, some of them after the action was brought, and because of their recency, raise no submissible issue as to title by adverse possession. The exceptions referred to are as follows.

*Block 3, lot 2* was acquired by the defendants Darrow in 1957. In 1958, time of year not specified, they established a maintenance wall along the seaward line of the lot. At that time the Swash water was standing about twenty feet seaward from the line. Fill dirt was hauled in, and the lot was built up from Ocean Boulevard to the wall and beyond the wall to the Swash water. In 1960, the Darrows built up a walkway crossing the Swash. Quite clearly, neither the minor fill to the Swash water in 1958, nor the 1960 establishment of a walkway crossing it, raised a jury issue as to title to the land between the Darrows' lot and the beach by adverse possession. There is no other evidence of possession by them or by any predecessor-in-title.

*Block 3, lot 3* was acquired by the defendant Clara Barfield and her husband in 1945. They built on their lot in the same year and soon afterward established a board-walk to the beach. This was laid in sections on a piled-up dirt foundation. Parts of it would frequently wash out and

be replaced. The boardwalk was used by other people also. Mrs. Barfield's daughter testified that people from as far as 10th Avenue would use the boardwalk. " . . . they would cut through. They still do it." The Barfields built a cement block retaining wall, standing about three feet high, on the seaward lot line, and the lot owners on either side built corresponding walls which tied into it. These walls were soon covered by sand. The Barfields and their neighbors made the same use of the Swash waters that others did. The establishment and maintenance of a boardwalk to the beach was no evidence of adverse use of the traversed area. There was simply no other such evidence.

*Block 5, lots 2, 3 and 4* were purchased in 1945, lot 2 by the defendant Mary F. Butler, and lots 3 and 4 by her father, J. T. Fonville. He built two small apartments in 1945. She built a duplex in 1953. Mrs. Butler was the only witness as to pre-1960 activity on these three lots or on the area separating them from the beach. We shall not undertake to summarize her somewhat vague testimony as to what use had been made of the intervening area. Instead, we quote at some length all of the testimony of this witness relied upon by defendants as tending to establish adverse possession:

"A.  We pushed it up several times.[3]

"Q.  Tell us as near as you can when you did these things.

"A.  Daddy had to do that when he built his place. That was the first thing we had to do, push it up.

"Q.  What did he do?

"A.  He pushed it in, and had coquina hauled in there by the big truck loads to try to fill it in, but eventually it would wash away. Finally, he didn't do anything to it for awhile. It was almost marshland down there, cattails and bull rush, if that's what you call it. We were always putting coquina in there to keep it dry and keep it filled in. But

---

[3] The witness' several references to pushing it up apparently refer to bulldozing sand onto the area from the beach.

we would have to go down Tenth Avenue and sometimes we couldn't go through there even after they put that little road down through there, and especially on high tide.

"Q. What year did Hazel come there? You remember when that was?

"A. Yes, I remember it very much. I believe it was 1954, October, 1954.

"Q. At the time you all bought this property was Withers Swash there at that time?

"A. Yes, sir.

"Q. About how wide was that at that time?

"A. Approximately from here to the door over there. You mean—

"Q. From in front of your house?

"A. From here to the door over there. Probably a little further.

"Q. Did you ever use that for anything? The swash, I am talking about? Such as fishing and hunting?

"A. Oh, yes.

"Q. What did you do?

"A. The children played in there. Even made little boats and paddled around out there. My three children.

"Q. Can you tell us about how deep it was at the time you all built there?

"A. Sometimes it was deep enough to swim in it, and sometimes it was marshy.

"Q. Have you done any other improvements on it since you first made improvements when you built?

"A. Every year we do, such as filling in, trying to plant grass and shrubbery.

"Q. That's between your house and the Atlantic Ocean?

"A. Yes, sir.

"Q. How do you get from the ocean to your house?

"A. At low tide, like I said, it was real marshy. You could walk through there, but it was rough. Then we could

go around on Tenth Avenue after they made that little road, go down the Boulevard and go on down through there. At real high tide sometimes you couldn't walk through there.

"Q. When Hazel came did you have to do any filling in?

"A. I really couldn't afford to at the time.

"Q. How about since that, have you filled in?

"A. At the time it was washed away so completely— In other words, it was as bare as this floor. In the front of my house I had two big picture windows, and after Hazel the dirt, and mess was up to the top of those picture windows. I couldn't afford to build in, fill in. This was all so expensive. I put up a brick wall and filled in a small space in front of my house. When Mr. Carroll bought next to me (1968, interpolated), then I went ahead and filled it in again from there to the beach and sewed some more grass, hauled in some more clay and coquina."

J. T. Fonville died prior to 1963. In that year lots 3 and 4 of block 5 were conveyed by his heirs to T. L. McDowell, who, in turn, conveyed these lots to M. N. Carroll in February, 1968. Mr. McDowell testified that when he acquired these lots the Swash area in front was deep and grown up in vegetation except for a build-up dirt walkway. In 1964, he spent some $900.00 bulldozing sand from the beach into this depression. Carroll testified that in 1968 he, Mrs. Butler and the owner of lot 1 in block 5 cooperated in filling in the property between their lots and the beach, stabilizing it with clay, planting grass, trees and installing other improvements.

We think that this testimony is palpably insufficient to raise a jury issue of title by adverse possession to the land between these lots and the beach. Mrs. Butler's testimony describes sporadic efforts to fill in the Swash area, inferably as a means of access to the sea. Those efforts commenced in 1945, but they were abandoned for

an unspecified interval prior to Hazel's 1954 visit. There is no testimony that Mrs. Butler's father did anything on the area after the hurricane, and she testified that she did not until 1968, when she joined Mr. Carroll, the recent purchaser of the lots formerly owned by her father, in filling and landscaping. If any adverse use of the disputed land before 1968 may be inferred from this testimony, no reasonable inference arises of such use for a continuous period of ten years.

We conclude that the testimony did not raise an issue for the jury as to title by adverse possession in any of the defendants, and that the court erred in refusing plaintiffs' motions based upon the absence of such evidence.

By all of the testimony, the former Swash area has ■ become dry land by the exertions of man—not by the gradual deposit by water of mud, sand or sediment. Hence, the principle that title to imperceptible additions to the shore from such deposits should follow the title to the short itself has no application. 56 Am. Jur., Waters, Sec. 476, *et seq.* (1947); *Spigener v. Cooner,* 8 Rich. (42 S. C. L.) 301 (1855). The circuit court erred in refusing to strike the plea of title by accretion from the various answers.

Thus, the defendants' plea of paramount title fails, leaving at issue their claim to such a right or interest in the land, by way of estoppel, easement, dedication or otherwise, as to prohibit its use for any purpose inconsistent with the plan of development adopted and put into effect when the subdivision was opened up and the lots sold. This issue is for decision by the court in the exercise of its equity jurisdiction and does not require a new trial.

The disputed land is conspicuously a part of the subdivision, bounded seaward by the public beach and inland by defendants' lots. As already described, most of the area, as shown on the plat, was covered by the Swash, a prominent landmark and place of public resort for taking fish and crab,

even water fowl according to one witness, and other recreation. With the possible exception of that in front of block 5, the unsubdivided land contiguous to the Swash was too small in area to be useful for residential development. The land in front of block 5 was of larger area because there the Swash was in a narrow channel. However, the lots in blocks 3, 4 and 5 were laid out to a uniform depth of 200 feet from Ocean Boulevard, and their seaward boundary is parallel to the Boulevard from 13th Avenue on the south to 10th Avenue on the north. This uniformity in the platted lots resulted in slight overlapping of the Swash at its widest point and in a disproportion of fastland at its narrowest. It is apparent, however, that the subdividers intended to make like disposition of the entire area between the lot lines and the beach.

A map in evidence, revised November, 1955, shows Ocean Boulevard to be the thoroughfare nearest the sea traversing Myrtle Beach from 29th Avenue South to 68th Avenue North. The lots on the seaward side of the Boulevard for its entire length are uniformly of one tier; that is to say, all are oceanfront lots, unless those in this subdivision and in adjoining Yaupon Circle, which are also separated from the ocean by Withers Swash, are exceptions. No such exception was indicated on the subdivision plat. Instead, the prevailing plan of development along Ocean Boulevard was adhered to in fixing the seaward line of the lots south of the Swash.

Recognizing, we infer, that the Swash was not theirs to convey, the subdividers did not attempt to extend the lots affected by it to the beach. Instead, they laid out the lots, as indicated above, and platted the Swash and the undivided fastland as an open area within the subdivision, on which defendants' lots abutted toward the sea. This open area was an integral part of the plan under which the subdivision was opened up and the lots offered for sale. Its presence enhanced the value of defendants' lots, and perhaps that of others, as compared with their value if the land intervening

between them and the sea had been reserved for future development. Under the facts of this case, the plat amounted to a representation that the area in question would remain open to the sea for the benefit of the lot purchasers. The evidence satisfies us that this was the intention of the sub-dividers. Neither they nor their successors made an inconsistent claim until the lapse of some twenty years and after enormous appreciation in the value of waterfront property on the Grand Strand had occurred.

The inclusion of the area within the bounds of the subdivision readily distinguishes this case from *Edwards v. Surratt,* 228 S. C. 512, 90 S. E. (2d) 906 (1956), upon which appellants rely as supporting their contention that only property conveyed according to the plat, by them or their predecessors, was affected by the plan of development. Instead, this case is governed by the following principle: "Generally, where property sold is described in the conveyance with reference to a plat or map on which streets, alleys, parks, and other open areas are shown, an easement therein is created in favor of the grantee. Such an easement is deemed a part of the property to which the grantee is entitled and of which he cannot be divested except by due process of law." 25 Am. Jur. (2d), Easements and Licenses, Sec. 26, p. 438 (1966). See also 28 C. J. S. Easements § 44 (1941); Annot., 7 A. L. R. (2d) 650 (1949).

Consistently with this principle, it was held in *Newton v. Batson,* 223 S. C. 545, 77 S. E. (2d) 212 (1953), that the owner of a lot in a residential subdivision adjoining a small triangular lot, which the evidence showed had been intended by the developer as a park or beautified area, had a special property interest in the latter entitling him to preserve its use for the intended purpose. The following was quoted from *Cason v. Gibson,* 217 S. C. 500, 61 S. E. (2d) 58 (1950), as dispositive, " '(W)here a conveyance of realty described the property sold by reference to a plat upon which streets, alleys, squares and parks are shown, an easement

therein is generally implied for the benefit of such lots as actually abut on such streets, alleys and parks even though they are dedicated to public use . . . .' " 223 S. C. at 550, 77 S. E. (2d) at 214.

We conclude that the circuit court erred in adjudging that the defendants, respectively, have title to the parcels of land in dispute; however, we hold that the defendants have a special property interest therein, whether by implied grant, estoppel, or otherwise, which bars plaintiffs from the relief sought by the complaint.

Reversed and remanded for dismissal of the complaint.

Moss, C. J., and LEWIS, BUSSEY and LITTLEJOHN, JJ., concur.

