23342

David H. LUCAS, Respondent v. SOUTH CAROLINA COASTAL COUNCIL, Appellant.

(404 S.E. (2d) 895)

Supreme Court

HARWELL, J., filed dissenting opinion in which CHANDLER, J., concurred.

*C.C. Harness, III,* of *S.C. Coastal Council,* Charleston, *for appellant.*

*Gedney M. Howe, III;* and *Ellison D. Smith, IV,* of *Smith & Bundy,* Charleston, *for respondent. Samuel H. Altman,* of *Altman & Sturgis, P.A.,* Charleston, *amicus curiae, for NCNB Bank of South Carolina, James S. Chandler, Jr., Pawleys Island, amicus curiae, for Sierra Club and S.C. Wildlife Federation, Steven M. Rudisill,* Rock Hill; and *Ronald A. Zumbruy, Edward J. Connor, Jr.,* and *Timothy V. Kassouni,* of *Pacific Legal Foundation,* Sacramento, Cal., *amicus curiae,* for *Pacific Legal Foundation.*

Heard April 2, 1990.

Decided Feb. 11, 1991.

TOAL, Justice:

This appeal concerns whether the enforcement and application of the 1988 Beachfront Management Act to the plaintiff-respondent's property is a taking of such property without just compensation.

## FACTS

David H. Lucas, the respondent, owns two vacant ocean-front lots in the Beachwood East Subdivision of the Wild Dunes development on the Isle of Palms in Charleston County, South Carolina. The Beachfront Management Act, S.C. Code Ann. § 48-39-10 *et seq.* (1989 Cum. Supp.) (here-

inafter referred to as "Act") limits construction within the beach/dune system in a critical area, as defined by the Act. As applied to the two Lucas lots, the Act prohibits, through statutorily mandated setback lines, the construction of any permanent structure (including a dwelling), save a small deck or walkway.

Lucas instituted an action in the Court of Common Pleas, asserting that the restrictions on the use of his lots worked a taking of his property without just compensation. The lower court agreed and awarded Lucas $1,232,387.50 as just compensation for the "regulatory" taking. The South Carolina Coastal Council, the administrator of the Beachfront Management Act, now appeals. We reverse.

## LAW/ANALYSIS

Although the regulatory takings question is a complex one, and although regulations affecting coastal property are especially problematic,[1] this appeal presents, in the end, what in our view is a relatively straightforward issue. The issue is whether governmental regulation of the use of property, in order to prevent serious public harm, amounts to a "regulatory taking" of property for which compensation must be paid. Lucas' position, which is dealt with more extensively below, is that if he is deprived of "all economically viable use" of his property, he must be compensated for it even if the regulation depriving him of such is a use-restriction regulation enacted to prevent serious public harm. Coastal Council's view, obviously, is that no compensation is due a landowner whose private use threatens serious public harm. We choose to characterize this issue as "straightforward" because, in the final analysis, Lucas' position and the

---

[1] For example, theories such as dedication, prescription, custom, purpresture, and the public trust doctrine can be resorted to by the public in an attempt to regulate private property immediately adjacent to the public property which sits below the mean highwater mark. *See generally* Finnell, *Public Access to Coastal Public Property: Judicial Theories and the Taking Issue,* 67 N.C.L. Rev. 627 (1989). We express no opinion concerning the force and validity of those theories in particular circumstances. We also express no opinion on the validity of portions of the Act to certain lands in light of our rule that, when a landowner causes his land to accrete through artificial means, he does not become the owner under the doctrine of title by accretion. *See Epps v. Freeman,* 261 S.C. 375, 200 S.E. (2d) 235 (1973).

position of our dissenting brothers, is the position of the dissent in *Keystone Bituminous Coal Ass'n. v. DeBenedictis*, 480 U.S. 470, 107 S. Ct. 1232, 94 L. Ed. (2d) 472 (1987), while the Coastal Council's view is represented by the *Keystone* majority, and by our decision in *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E. (2d) 327 (1984). We choose not to overrule *Carter*, and we choose to follow the majority view rather than the dissent in *Keystone*.

Lucas concedes that the Beachfront Management Act is properly and validly designed to preserve the extremely valuable resource which is South Carolina's beaches. He concedes that the preservation of this existing public resource from harm is a "laudable goal." *See* Respondent's Brief, at p. 4. He admittedly fails to attack the validity of the Act, and therefore concedes the validity of the legislative declaration of its "findings" and "policy" embodied in Sections 1 and 2 of 1988 Act No. 634.[2] This Court is therefore in no position to question the legislative scheme or purpose. Section 1 of the Act reads:

SECTION 1. The General Assembly finds that:

(1) *The beach/dune system along the coast of South Carolina is extremely important to the people of this State* and serves the following functions:

(a) *protects life and property by serving as a storm barrier* which dissipates wave energy and contributes to shoreline stability in an economical and effective manner;

(b) *provides the basis for a tourism industry* that generates approximately two-thirds of South Carolina's annual tourism industry revenue which constitutes a significant portion of the state's economy. The tourists who come to the South Carolina coast to enjoy the ocean and

---

[2] It appears that Sections 1 and 2 of the 1988 Act were intended to be labeled as amendments to S.C. Code Ann. §§ 48-39-20 (1987) (entitled "Legislative declaration of findings") and 48-39-30 (1987) (entitled "Legislative declaration of state policy"), although they are not designated as such in the actual codification. *See* Editor's Note to § 48-39-270. The sections have, during the pendency of this case, been incorporated into the codification as Sections 48-39-250 and 48-39-260. Concomitantly, sections 1 and 2 of the 1988 Act have, as such, been repealed. *See* Act 607, 1990 S.C. Acts 2581.

dry sand beach contribute significantly to state and local tax revenues;

(c) *provides habitat for numerous species of plants and animals, several of which are threatened or endangered.* Waters adjacent to the beach/dune system also provide habitat for many other marine species;

(d) *provides a natural health environment for the citizens of South Carolina* to spend leisure time which serves their physical and mental well-being.

(2) Beach/dune system vegetation is unique and extremely important to the vitality and preservation of the system.

(3) *Many miles of South Carolina's beaches have been identified as critically eroding.*

(4) Chapter 39, Title 48, Code of Laws of South Carolina, 1976, Coastal Tidelands and Wetlands, does not provide adequate jurisdiction to the South Carolina Coastal Council to enable it to effectively protect the integrity of the beach/dune system. Consequently, without adequate controls, development has been unwisely sited too close to the system. This type of development has jeopardized the stability of the beach/dune system, accelerated erosion, and endangered adjacent property. It is in both the public and private interests to protect the system from this unwise development.

(5) The use of armoring in the form of hard erosion control devices such as seawalls, bulkheads, and rip-rap to protect erosion-threatened structures adjacent to the beach has not proven effective. These armoring devices have given a false sense of security to beach front property owners. In reality, these hard structures, in many instances, have increased the vulnerability of beach front property to damage from wind and waves while contributing to the deterioration and loss of the dry sand beach which is so important to the tourism industry.

(6) *Erosion is a natural process which becomes a significant problem for many only when structures are*

*erected in close proximity to the beach/dune system. It is in both the public and private interests to afford the beach/dune system space to accrete and erode in its natural cycle. This space can be provided only by discouraging new construction in close proximity to the beach/dune system and encouraging those who have erected structures too close to the system to retreat from it.*

(7) Inlet and harbor management practices, including the construction of jetties which have not been designed to accommodate the long shore transport of sand, can deprive downdrift beach/dune systems of their natural sand supply. Dredging practices which include disposal of beach quality sand at sea also can deprive the beach/dune system of much-needed sand.

(8) It is in the state's best interest to protect and to promote increased public access to South Carolina's beaches for out-of-state tourists and South Carolina residents alike.

(9) Present funding for the protection, management, and enhancement of the beach/dune system is inadequate.

(10) There is no coordinated state policy for post-storm emergency management of the beach/dune system.

(11) A long-range comprehensive beach management plan is needed for the entire coast of South Carolina to protect and effectively manage the beach/dune system, thus preventing unwise development and minimizing man's adverse impact on the system.

(Emphasis added).

Section 2 of the Act reads:

SECTION 2. In recognition of its stewardship responsibilities, the policy of South Carolina is to:

(1) protect, preserve, restore, and enhance the beach/dune system, the highest and best uses of which are declared to provide:

(a) a barrier and buffer from high tides, storm surge, hurricanes, and normal erosion;

(b) a public area which serves as a major source of state and local revenue;

(c) habitat for indigenous flora and fauna;

(d) a place which harbors natural beauty;

(2) create a comprehensive, long-range beach management plan and require local comprehensive beach management plans for the protection, preservation, restoration, and enhancement of the beach/dune system. These plans must promote wise use of the state's beach front to include a gradual retreat from the system over a forty-year period;

(3) severely restrict the use of hard erosion control devices to armor the beach/dune system and to encourage the replacement of hard erosion control devices with soft technologies as approved by the Coastal Council which will provide for the protection of the shoreline without long-term adverse effects;

(4) encourage the use of erosion-inhibiting techniques which do not adversely impact the long-term well-being of the beach/dune system;

(5) promote carefully planned nourishment as a means of beach preservation and restoration where economically feasible;

(6) preserve existing public access and promote the enhancement of public access to assure full enjoyment of the beach by all our citizens including the handicapped;

(7) involve local governments in long-range comprehensive planning and management of the beach/dune system in which they have a vested interest;

(8) establish procedures and guidelines for the emergency management of the beach/dune system following a significant storm event.

By failing to contest these legislative findings, Lucas concedes that the beach/dune area of South Carolina's shores is an extremely valuable public resource; that the erection of new construction, *inter alia*, contributes to the

erosion and destruction of this public resource; and that discouraging new construction in close proximity to the beach/dune area is necessary to prevent a great public harm. This Court is likewise bound by these uncontested legislative findings. In lieu of any attack whatsoever on the statutory scheme, Lucas rests on a solitary argument, *viz.*, that he is still, despite these concessions, entitled to compensation from the State. He contends that a single legal test exists which, if failed, conclusively establishes that a "regulatory taking" has occurred. Lucas maintains that if a regulation operates to deprive a landowner of "all economically viable use" of his property, it has worked a "taking" for which compensation is due, regardless of any other consideration. This is simply an erroneous statement of existing law.

At the outset, we recently noted that "[t]he United States Supreme Court has never articulated a 'set formula' to determine where regulation ends and taking begins." *Moore v. Sumter County Council,* 300 S.C. 270, 387 S.E. (2d) 455, 457 n. 2 (1990). As a result, "takings" cases have been decided by the Supreme Court on a case-by-case basis, with the Court considering a variety of factors depending upon the circumstances before them. Among the factors considered are: (1) the economic impact of the regulation; (2) the regulation's interference with investment backed expectations; (3) the character of the government action (whether there is a physical invasion); and (4) the nature of the State's interest in the regulation. *See Keystone, supra,* 107 S. Ct. at 1244, 1247.

One or more but fewer than all of these factors may be critical and determinative in a given case. A clear example of this is the fact that the United States Supreme Court has almost invariably found a taking when the government regulation is characterized as a permanent physical occupation. *See Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435-438, 102 S. Ct. 3164, 3175-3177, 73 L. Ed. (2d) 868 (1982).

A second clear example is in the fact that a taking has not been found when the regulation exists to prevent serious public harm. *See, e.g., Mugler v. Kansas,* 123 U.S. 623, 8 S. Ct. 273, 31 L. Ed. 205 (1887) (prohibition on the manufacture and sale of intoxicating liquors); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S. Ct. 143, 60 L. Ed. 348 (1915) (ordinance prohibiting the manufacture of bricks near residents in Los Angeles);

*Miller v. Schoene*, 276 U.S. 272, 48 S. Ct. 246, 72 L. Ed. 568 (1928) (state action destroying diseased cedar trees of certain property owners to prevent the infection of apple orchards); and *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. (2d) 130 (1962) (prohibition against excavating below the water table in order to extract gravel).

The Supreme Court has noted that the "special status" of this kind of regulation can be understood by way of "the simple theory that since no individual has a right to use his property so as to create a nuisance or otherwise harm others, the State has not 'taken' anything when it asserts its power to enjoin the nuisance-like activity." *Keystone, supra,* 107 S. Ct. at 1245 n. 20. In conjunction with this analysis, the Supreme Court has stated it "is hard to imagine a different rule that would be consistent with the maxim '*Sic utere tuo ut alienum non laedas*' [use your own property in such manner as not to injure that of another]." (Brackets in the original). *Id.,* 107 S. Ct. at 1246 n. 22.

This Court has repeatedly used this same analysis in determining regulatory takings questions. Finding that the regulation under attack prevented a use seriously harming the public, we have concluded that no regulatory taking has occurred. *See, e.g., Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E. (2d) 327 (1984) (regulating the use and alteration of wetlands); *Arnold v. City of Spartanburg*, 201 S.C. 523, 23 S.E. (2d) 735 (1943) (regulating the sale of intoxicating liquors); and *Richards v. City of Columbia*, 227 S.C. 538, 88 S.E. (2d) 683 (1955) (mandating the repair, alteration, or closing of dwellings unfit for habitation in order to protect public health and welfare).

In some of our opinions, we have indicated that no compensation is ever due a landowner when the State acts pursuant to its police power. *See, e.g., Brabham v. City of Sumter*, 275 S.C. 597, 274 S.E. (2d) 297 (1981) and *Edens v. City of Columbia*, 228 S.C. 563, 91 S.E. (2d) 280 (1956). This is perhaps too mechanical. In at least one case, the United States Supreme Court found a regulatory taking despite the fact that the State was acting pursuant to its police powers. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164, 73 L. Ed. (2d) 868 (1982). In *Loretto,* a New York law required landlords to permit cable television companies to in-

stall cable facilities on their rental property. The law was validly within the New York police powers as authorizing "rapid development of and maximum penetration by a means of communication which has important educational and community aspects." *Id.* 102 S. Ct. at 3170. Despite this regulation for the public good, the Supreme Court found a taking since there was a physical occupation of the landowner's property.

Hence, merely because the State acts within its police powers does not end the inquiry. Nevertheless, the fact remains that the Supreme Court has time and again held that when a State merely regulates use, and acts to prevent a serious public *harm*, there is no "taking" for which compensation is due. *See Mugler, Hadacheck, Miller,* and *Goldblatt, supra.* It is therefore the *way* the police power is exercised that is of critical import. Were we to adopt Lucas' argument, whether the State acts pursuant to its police power would be *wholly* irrelevant.

As mentioned earlier, Lucas fails to attack in any way the legislature's "findings" that new construction would cause serious public harm. This amounts to a concession that the *Mugler* "nuisance-like exception" applies. This Court is in no position to, *sua sponte,* take issue with these legislative findings. Instead, we are constrained to base our ruling only upon Lucas' contention that a taking of property occurs when he is deprived, by operation of the regulation, of "all economically viable use" of his property. Lucas advances this proposition because of the United States Supreme Court's use of the "all economically viable use" test in certain regulatory taking cases. *See Keystone,* 107 S. Ct. at 1247 (*citing Agins v. Tiburon,* 447 U.S. 255, 100 S. Ct. 2138, 65 L. Ed. (2d) 106 (1980)).[3] It is clear, however, that such is not the dispositive test in *all* cases. Lucas' position is clearly erroneous in light of the fact that the *Keystone* majority squarely rejected the identical contention in 1987.

In the *Keystone* case, the United States Supreme Court dealt with a takings challenge by coal companies to the Penn-

---

[3] If Lucas can demonstrate a deprival of all economically viable use of his land, there is no need to weigh factors such as the economic impact of the regulation and/or the regulation's interference with investment backed expectations. Such a showing by Lucas would by necessity weigh these factors in his favor.

sylvania Subsidence Act, which required that fifty percent of the coal beneath certain structures be kept in place to provide surface support. In relating the history of the present takings analysis, the Court first cited *Mugler v. Kansas,* 123 U.S. 623, 668, 8 S. Ct. 273, 300, 31 L. Ed. 205 (1887) and its progeny for the proposition that, "prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking . . ." *Keystone, supra,* 107 S. Ct. at 1244.

Twenty-five years after *Mugler,* the Supreme Court decided the case of *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922). There, Justice Holmes wrote,

> Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts.

*Id.* at 413, 43 S. Ct. at 159. *Pennsylvania Coal* is relied upon by Lucas for his asserted proposition that in *all* cases, when *all* economically viable use is extinguished by regulation, compensation is due. This exact contention was presented to the *Keystone* Court, which rejected such a rule.

The *Keystone* Court explained:

> We reject petitioner's implicit assertion that *Pennsylvania Coal* overruled [*Mugler* and its progeny] *which focused so heavily on the nature of the state's interest* in the regulation. Just five years after the *Pennsylvania Coal* decision, Justice Holmes joined the Court's unanimous decision in *Miller v. Schoene,* 276 U.S. 272, 48 S. Ct. 246,

72 L. Ed. 568 (1928), holding that the takings clause did not require the State of Virginia to compensate the owner of cedar trees for the value of the trees that the State had ordered destroyed. The trees needed to be destroyed to prevent a disease from spreading to nearby apple orchards, which represented a far more valuable resource. . . . [I]t was clear that the State's exercise of its police power to prevent the impending danger was justified, and did notrequire compensation.

(Emphasis added) 480 U.S. at 490, 491, 107 S. Ct. at 1244, 1245. In *Keystone*, the Supreme Court again approved the *Mugler* rule that, in some cases, no compensation is due regardless of the remaining worth of the property after regulation. Specifically, the *Keystone* Court noted that "[l]ong ago it was recognized that 'all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community.' " 480 U.S. at 491-92, 107 S. Ct. at 1245 (*quoting Mugler v. Kansas*, 123 U.S. at 665, 8 S. Ct. at 299).[4]

Once again, we note that Lucas does not challenge the fact that the legislation here is necessary to prevent serious injury to the community, nor does he contend that the setback requirements affecting him are unreasonable or disproportionate to the goal of preventing the specified harms. In fact, Lucas does not even seek an injunction to prevent enforcement of the Act. Instead, Lucas merely prays for damages and asserts that he is entitled to such, regardless of how the proposed use of his property harms the public, because all economically viable use of his land has been extinguished. Lucas' argument tracks the position of Justice Rehnquist's dissent in

---

[4] We note only to prevent possible confusion that the *Keystone* majority proceeded, after reaffirming the *Mugler* rule, to analyze the taking issue before them by looking at whether the Pennsylvania Subsidence Act deprived the owner of all economically viable use of their lands. However, it is clear that the Court did not engage in this latter analysis for reasons of necessity, but instead did so because the plaintiff also failed to show adequate deprival of viable economic use. The Court stated, after declaring the validity of the *Mugler* rule, "[n]onetheless, we *need not* rest our decision on this factor alone (meaning the *Mugler* rule), because petitioners have *also* failed to make a showing of [sufficient] diminution of value. . . ." *Id.*, 480 U.S. at 492-93, 107 S. Ct. at 1246.

*Keystone.*[5] We follow the *Keystone* majority and also reject this contention.

Our decision in *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E. (2d) 327 (1984) is perhaps the best South Carolina representative of the *Keystone* majority analysis in action. In *Carter* we held that "the state may properly regulate the use of property where uncontrolled use would be harmful to the public interest; and this regulation, even though it prohibits a beneficial use, will not necessarily be deemed a taking in the constitutional sense." *Id.*, 281 S.C. at 204, 314 S.E. (2d) at 329. There, we upheld the validity of the 1977 Coastal Zone Management Act, which prevented the uncontrolled use of coastal wetlands, since such use had a detrimental effect upon "the public welfare." *Id.* Our analysis in *Carter* did not contain a discussion of whether any "economically viable use" remained in the property of the landowners after regulation. It is clear, however, that the plaintiffs in *Carter* were as much deprived of all economically viable use of their lands as Lucas is. To adopt Lucas' argument would therefore be to overrule *Carter*. We choose not to do so.

*Carter* is an example of an appropriate application of the *Mugler* rule regarding regulation designed to prevent a serious public harm.[6] The application of the *Mugler* rule to appropriate regulatory takings questions has been validated in the recent *Keystone* decision.[7] The *Mugler* rule may therefore be

[5] The *Keystone* dissent labels the *Mugler* line of cases the "nuisance *exception,*" but then states that in no case has the Court "accepted the proposition that the State may completely extinguish a property interest or prohibit all use without providing compensation." 480 U.S. at 513, 107 S. Ct. at 1257 (Rehnquist J. dissenting). Lucas' argument is clearly simply a rephrasing of this same position.

[6] The *Carter* decision relies in part on *Goldblatt v. Hempstead*, 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. (2d) 130 (1962), which is one of *Mugler's* progeny.

[7] During the pendency of this case, two other courts have interpreted *Keystone* in exactly the way we have. In *McNulty v. Town of Indialantic*, 727 F. Supp. 604 (M.D. Fla. 1989), a Florida District Court rejected a landowner's contention that a town ordinance imposing setback requirements on oceanfront property worked a "taking." The *McNulty* Court held, in pertinent part, "the government can destroy [by regulation] all economic use if necessary to avoid a public nuisance or nuisance like use." 727 F. Supp. at 609. In *Presbytery v. King County*, 114 Wash. (2d) 320, 787 P. (2d) 907 (1990) *cert. denied* — U.S. —, 111 S. Ct. 284, 112 L. Ed. (2d) 238 (1990) a county ordinance prohibited all construction on several wetlands lots of the plaintiff-landowner. The *Presbytery* Court observed that if a regulation protects the public from harm, and does not infringe upon the right of the landowner to possess, exclude others, and dispose of the property, no "taking" has occurred.

applied again under the appropriate set of facts. Lucas' *de facto* concession of the validity of the legislative scheme and of its purposes makes the instant set of facts appropriate for the application of the *Mugler* rule. We need not address the remaining issues in this case, and we express no opinion regarding them.[8] Accordingly, we reverse the decision of the lower court.

GREGORY, C.J., and FINNEY, J., concur.

HARWELL and CHANDLER, JJ., dissent in separate opinion.

HARWELL, Justice, dissenting:

I respectfully dissent. For the reasons discussed below, I would affirm the circuit court order which determines that application of the Beachfront Management Act under these facts does constitute a taking, and hold that the Coastal Council must either compensate·Lucas in the amount set forth in the order of the circuit court or issue a permit for the construction of habitable structures on his property pursuant to the 1990 amendments to the Beachfront Management Act.[1]

## DISCUSSION

The Fifth Amendment of the United States Constitution provides that "private property [shall not] be taken for public use without just compensation." U.S. Const. amend. V. The South Carolina Constitution provides that "private property shall not be taken for private use without the consent of the owner, nor for public use without just compensation being first made therefor." S.C. Const. Art. I, § 13. Takings cases are generally recognized as falling into one of two categories: those pursuant to an exercise of eminent domain and those pursuant to an exercise of the police power. Eminent domain

---

[8] We also do not address the issue, not raised in this case, of whether Lucas may build a habitable structure or other structures under the provisions and procedures of the 1990 amendments to the Beachfront Management Act. *See* Act 607, 1990 S. C. Acts 2581.

[1] Although certain amendments to the Beachfront Management Act had not been enacted at the time this case was abjudicated, I note that neither the majority opinion nor the dissent prohibit Lucas from pursuing a course of action under the 1990 amendments which would enable him to construct a new habitable structure within the guidelines set forth in the amendments. *See,* S.C. Code Ann. §§ 48-39-290(A)(6) and 48-39-290(D)(1) (Supp. 1990).

involves the taking of property for public use for which compensation is required to be made; police power involves regulation of private property to prevent its use in a manner detrimental to the public interest and will not necessarily result in a taking in the constitutional sense. *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 204, 314 S.E. (2d) 327, 329 (1984). A governmental taking of property may, however, be accomplished without the formal apparatus of eminent domain; a taking may result from a government regulation in a particular area. *First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 316, 107 S. Ct. 2378, 2386, 96 L. Ed. (2d) 250, 265 (1987).

The question of when regulation pursuant to a police power becomes a taking is not easily answered. Despite the wealth of authority on the subject of regulatory takings, this is an area of considerable confusion. Indeed, as Justice Stevens recognized in his dissent in *First English Evangelical,* the regulatory takings decisions of the United States Supreme Court have been "open-ended and standardless." 482 U.S. at 340, 107 S. Ct. at 2378, 96 L. Ed. (2d) at 280 (footnote 17). As one commentator noted, the "[r]egulatory taking doctrine is the most perplexing area of American land use law."[2] This case necessitates explication of the pertinent decisions in this area and reflects my interpretation of regulatory takings law.

The starting point for this discussion with the 1887 case of *Mugler v. Kansas,* 123 U.S. 623, 8 S. Ct. 273, 31 L. Ed. 205 (1887) in which the Supreme Court recognized that "government can prevent a property owner from using his property to injure others without having to compensate the owner for the value of the forbidden use." *Penn Central Transportation Company v. New York,* 438 U.S. 104, 144, 98 S. Ct. 2646, 2669, 57 L. Ed. (2d) 631, 661 (1978). At issue in *Mugler* was a statute prohibiting use of a distillery for the manufacture of intoxicat-

---

[2] Settle, *Regulatory Taking Doctrine in Washington, Now You See It, Now You Don't,* 12 U. Puget Sound L. Rev. 339 (1989). The lack of uniformity in this area has been noted by other commentators. *See, e.g.* C. Harr, Land Use Planning (3d ed. 1977); Berger, *A Policy Analysis of the Taking Problem,* 49 N.Y.U.L. Rev. 165 (1974); Michelman, *Property, Utility, and Fairness: Comments on the Ethical Foundations of "Just Compensation" Law,* 80 Harv. L. Rev. 1165 (1967); Rose, *Mahon Reconstructed: Why the Takings Clause is Still a Muddle,* 57 S. Cal. L. Rev. 56 (1984).

ing liquors. The Supreme Court upheld the statute and reasoned that the power of the State to prohibit uses of property "prejudicial to the health, the morals, or the safety of the public, is not . . . burdened with the condition that the State must compensate such individual owners for pecuniary losses they may sustain." *Mugler v. Kansas*, 123 U.S. at 669, 8 S. Ct. at 301, 31 L. Ed. at 213.

*Mugler* stands for the proposition that where the legislature has deemed an act to be necessary for the public's health, safety, and welfare, the judiciary need not scrutinize the acts of the legislature regardless of the extent of loss suffered by the property owner. A prohibition on the use of property, enacted in the interest of the community as a whole, the *Mugler* court held, cannot be deemed a taking or appropriation.

For the same reasons as those articulated in *Mugler*, the Supreme Court has held other state action not to constitute a compensable taking when necessary to prevent property owners from using such property in a manner which I perceive to be best described as nuisance oriented. *See, e.g. Hadacheck v. Sebastian*, 239 U.S. 394, 36 S. Ct. 143, 60 L. Ed. 348 (1915) (statute disallowing operation of a brickyard in a residential area; *Reinman v. City of Little Rock*, 237 U.S. 171, 35 S. Ct. 511, 59 L. Ed. 900 (1915) (law disallowing operation of livery stable in downtown area); *Miller v. Schoene*, 276 U.S. 272, 48 S. Ct. 246, 72 L. Ed. 568 (1928) (statute ordering destruction of red cedar trees because they produced cedar rust fatal to apple trees, an important state crop).

The viability of the *Mugler* analysis was first questioned in *Pennsylvania Coal v. Mahon*, 260 U.S. 393, 43 S. Ct. 158, 67 L. Ed. 322 (1922). Instead of following the *Mugler* approach of deferring to the judgment of the legislature with respect to the regulation at issue in *Pennsylvania Coal*, the Supreme Court instead evaluated the subject regulation and determined that the public interest it protected was not sufficient to warrant an exercise of police power. Justice Holmes, writing for the majority, noted that "[a] . . . strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change." *Pennsylvania Coal v. Mahon*, 260 U.S. at 416, 43 S. Ct. at 160, 67 L. Ed. at 326. Rather, the general rule as enunciated in *Pennsylvania Coal* is that "[w]hile

property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." 260 U.S. at 415, 43 S. Ct. at 160, 67 L. Ed. at 326.

The test which emerged from *Pennsylvania Coal* is that a reviewing court should first determine whether a regulation sufficiently implicates the public interest such that a state can enact it as a legitimate police power measure; and second, determine the extent of diminution in value suffered by the property owner. If the regulation goes too far, it is a taking for which an owner must be compensated. The test has recently been more succinctly stated to be that land use regulation can effect a taking if it "does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land." *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S. Ct. 2138, 2141, 65 L. Ed. (2d) 106, 112 (1980).

After *Pennsylvania Coal,* the *Mugler* rule was no longer viewed as dispositive. In fact, the *Mugler* approach was essentially the same as that of the *minority* opinion in the *Pennsylvania Coal* case: that as long as a regulation serves an appropriate means to public end, restriction upon use does not constitute a taking merely because it deprives the owner of the property's only profitable use. *Pennsylvania Coal v. Mahon,* 260 U.S. at 417, 43 S. Ct. at 160, 67 L. Ed. at 326. (Brandeis, J. dissenting). Therefore, after *Pennsylvania Coal,* the *Mugler* case was thought by many to have fallen by the wayside. This perception was dispelled however, five years later with the Supreme Court's decision in *Miller v. Schoene, supra.* In *Miller,* the Supreme Court, applying *Mugler,* upheld a statute which required the owners of red cedar trees to destroy the trees because they produced cedar rust, a disease fatal to the state's apple crop. Thus, after *Miller,* some confusion existed as to whether to apply the *Mugler* rule or that of *Pennsylvania Coal.* In two subsequent cases, *Goldblatt v. Hempstead,* 369 U.S. 590, 82 S. Ct. 987, 8 L. Ed. (2d) 130 (1962) and *Penn Central Transportation Company v. New York City,* 438 U.S. 104, 98 S. Ct. 2646, 57 L. Ed. (2d) 631 (1978), the Supreme Court applied, respectively, the *Mugler* rule and the *Pennsylvania Coal* test.

In *Goldblatt v. Hempstead, supra,* the Supreme Court upheld, pursuant to a *Mugler* nuisance analysis, a statute forbidding excavation of sand below the water line. The *Goldblatt*

Court nonetheless recognized that certain regulation may be "so onerous as to constitute a taking which constitutionally requires compensation." 369 U.S. at 594, 82 S. Ct. at 990, 8 L. Ed. (2d) at 133.

In *Penn Central Transportation Company v. New York City, supra,* the Supreme Court upheld a landmark preservation law which prohibited Penn Central Railroad from erecting an office tower on top of the Grand Central Railroad Terminal. In *Penn Central* the Court candidly admitted that it had previously been unable to develop any "set formula" for determining when "justice and fairness" require the government to compensate landowners. 438 U.S. at 124, 98 S. Ct. at 2659, 57 L. Ed. (2d) at 648. In upholding the preservation law, the Court applied the *Pennsylvania Coal* test and determined that because the regulation served a strong public interest, did not completely destroy the economic value of the property, and did not substantially interfere with reasonable investment backed expectations it did not constitute a taking. The test first enunciated in *Pennsylvania Coal,* therefore continued in *Penn Central* to be that regulation can effect a taking if it "does not substantially advance legitimate state interests . . . or denies an owner economically viable use of its land." Because the preservation law advanced a legitimate state interest and the owner retained economically viable use of the terminal, a taking was determined not to have occurred.

The next significant decision of the Supreme Court to address the test to be applied in regulatory takings cases is *Keystone Bituminous Coal Association v. Debenedictis,* 480 U.S. 470, 107 S. Ct. 1232, 94 L. Ed. (2d) 472 (1987). In *Keystone,* the plaintiffs challenged the constitutionality of a Pennsylvania statute known as the Bituminous Mine Subsidence and Land Conservation Act. The Subsidence Act required coal companies to keep in the ground at least 50% of the coal beneath defined structures to protect these structures from subsidence damage. Although the Supreme Court held that a taking had not occurred, the method by which it arrived at this holding has been the subject of considerable debate. Part of the reason for this debate is the persistent confusion over when *Mugler* is applicable. Although it continues to recognize the vitality of the *Mugler* line of cases, the *Keystone* Court nonetheless continues to retain the two prong test first recognized in

*Pennsylvania Coal.* The *Keystone* Court unequivocally recognizes that it retains this as the test by stating:

> "The two factors that the Court considered relevant [in *Pennsylvania Coal]*, have become integral parts of our takings analysis. We have held that land use regulation can effect a taking if it 'does not substantially advance legitimate state interests, . . . or denies an owner economically viable use of his land.' *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S. Ct. 2138, 2141, 65 L. Ed. (2d) 106, 112 (1980) (citations omitted); *see also Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S. Ct. 2646, 2659, 57 L. Ed. (2d) 631, 648 (1978)."

and continues by holding that: "[a]pplication of these tests to petitioners' challenge demonstrates that they have not satisfied their burden of showing that the [Act] constitutes a taking." 480 U.S. at 485, 107 S. Ct. at 1242, 94 L. Ed. (2d) at 488. Clearly, then, despite the myriad of considerations which go into an analysis of the factors included in the above mentioned test, it still emerges as the test after *Keystone.*

The first prong of this traditional test is discussed under the heading of "The Public Purpose." *Keystone Bituminous Coal Association v. Debenedictis,* 480 U.S. at 485, 107 S. Ct. at 1242, 94 L. Ed. (2d) at 488. It is at this point that the Court explicitly holds that its *Mugler* line of cases were not overruled by *Pennsylvania Coal.* 480 U.S. at 490, 107 S. Ct. at 1244, 94 L. Ed. (2d) at 491. The Court then goes on to affirm that a state's interest in "preventing activities similar to public nuisances is a substantial one, which in many instances has not required compensation." 480 U.S. at 492, 107 S. Ct. at 1246, 94 L. Ed. (2d) at 493. The Court further holds that the act at issue in *Keystone* "plainly seeks to further such an interest." *Id.* In so holding the *Keystone* Court equates subsidence mining to the nuisances sought to be abated in the *Mugler* line of cases. Accordingly, the *Keystone* opinion reaffirms the teaching of *Mugler* that certain uses are so noxious that an owner is not entitled to compensation, and that "the nature of the state action plays [an important role] in our takings analysis." 480 U.S. at 490, 107 S. Ct. at 1245, 94 L. Ed. (2d) at 491. Although the *Keystone* opinion marks a continued recognition of the *Mugler* rule, it does not abolish the *Pennsylvania Coal* fac-

tors. Further, the *Keystone* Court does not hold that every exercise of police power can escape the Constitution by calling that which it seeks to prevent a nuisance. Such an interpretation would totally eviscerate the takings clause. Indeed, if we were to accept an interpretation of *Keystone,* based on *Mugler,* that any exercise of police power could not effect a taking, we would have to say that there would never be any need to reach the second part of the test: diminution in value. No matter how valueless a person's property, if the taking was pursuant to a valid exercise of the police power it could *never* be compensated. As feared by the dissenters in *Keystone,* this could become an exception which would swallow the rule. *Keystone,* 480 U.S. at 512, 107 S. Ct. at 1256, 94 L. Ed. (2d) at 505 (Rehnquist, J., dissenting).

The Constitution of the United States and of South Carolina provided a just compensation clause for the protection of citizens; surely the framers of these constitutions never intended for this protection to be distinguished away in order to allow States to avoid compensating an individual required to bear a burden which in fairness should be borne by all. Therefore, I simply refuse to accept that the *Mugler* line of cases "grant carte blanche to government agencies to regulate private property into oblivion." Berger, *The Year of the Taking Issue,* 1 B.Y.U.J. Pub. L. 261, 279 (1987). Rather I would hold that some factual situations may lend themselves to the harsh rule in *Mugler,* whereas others must be recognized as situations in which one individual should not be called upon to bear a burden which in fairness should be borne by all. My interpretation of *Keystone* is that a court must first review the public purpose of a regulation. Some regulations will be held unconstitutional because the public purpose for which they are enacted is not deemed to be legitimate or sufficient. Other regulations may provide for the prevention of a nuisance and as such will not require compensation to an affected landowner. Other regulations not designed to prevent a nuisance may nonetheless legitimately advance state interests and yet require compensation upon a showing of a loss of economically viable use of land.

In my opinion the Beachfront Management Act does not have as its *primary* purpose the prevention of a nuisance and is therefore not subject to the *Mugler* analysis. The activities

and effects the Act seeks to prohibit do not rise to such a level as to be fairly considered "noxious." The primary purpose of the Beachfront Management System is to protect and foster the regeneration of the beach/dune system, the benefits of which enure to the State of South Carolina by among other things, promoting tourism, creating a habitat for indigenous flora and fauna, creating a place which harbors natural beauty, and providing a barrier and buffer from high tides, storm surge, hurricanes and normal erosion. The Act also lists other similar findings and policies of the Act. Upon my review of the Act, I conclude that none of these intended purposes can fairly be said to resemble a nuisance. The goals which the Act seeks to accomplish do not appear in any way similar to protecting an important state resource from an infectious disease (*Miller v. Schoene*), prohibiting excavations below the water table for safety purposes (*Goldblatt*), prohibiting an illegal use of a distillery (*Mugler*), preserving the residential integrity of an area by prohibiting a brickyard (*Hadacheck*) or protecting patrons of a downtown area from the unpleasantness associated with a livery stable (*Reinman*). Accordingly, I do not find as did the *Keystone* Court, that the Act at issue here plainly seeks to further "public interest in preventing activities similar to public nuisances" such that it is entitled to the protection afforded by *Mugler*.

This is not to say that the Act itself is invalid. Even though an act is not of the *Mugler* variety, it can remain valid if it nonetheless advances a legitimate state interest. However, if it is not a *Mugler* type act, despite the fact that it advances a legitimate state interest, compensation will be necessary where the act deprives an owner of economically viable use of his land. Lucas has conceded the "laudable" goals of the Act and does not challenge the legitimacy of its public purpose. Thus, the remaining question is whether his property retains economically viable use.

Although, the *Keystone* Court indicated that it could end its analysis with its determination that the Subsidence Act sought to "prevent activities similar to public nuisances," it held that it "need not rest [its] decision on this factor alone, because petitioners have also failed to make a showing of diminution of value sufficient to satisfy the test set forth in

*Pennsylvania Coal*[3] and our other regulatory takings cases."
*Keystone Bituminous Coal v. Debenedictis,* 480 U.S. at 493,
107 S. Ct. at 1246, 94 L. Ed. (2d) at 493. The Court did not
have to reach the diminution in value question because the
only issue left to it by the federal district court was whether
the "mere enactment of the statutes and regulations consti-
tutes a taking." *Id.* The next phase of the case would have
concerned evidence about the actual effects the Subsidence
Act had on the owners' property.

In assessing the question of whether Lucas retains any eco-
nomically viable use of his land, we are nonetheless guided by
the *Keystone* decision. The *Keystone* Court held that the criti-
cal distinction in this regard involves a comparison of the
value that has been taken from the property with the value
that remains in the property. 480 U.S. at 497, 107 S. Ct. at
1248, 94 L. Ed. (2d) at 496. "[W]here an owner possesses a full
bundle of property rights, the destruction of one 'strand' of
the bundle is not a taking because the aggregate must be
viewed in its entirety." *Id.* [citation omitted]. Applying these
factors, the *Keystone* Court determined that

> When the coal that must remain beneath the ground is
> viewed in the context of any reasonable unit of petition-
> ers' coal mining operations and financial-backed expecta-
> tions, it is plain that petitioners have not come close to
> satisfying their burden of proving that they have been
> denied the economically viable use of that property.

480 U.S. at 499, 107 S. Ct. at 1249, 94 L. Ed. (2d) at 497. The
Court further determined that there was no showing that "pe-
titioners' reasonable investment backed expectations" were
materially affected. *Id.*

The facts of *Keystone* contrast sharply with those present
in this case. The testimony in this case was that Lucas pur-
chased two lots for development. Lucas planned to erect sin-
gle family dwellings on the lots and intended to put one home
on the market for sale and retain one for his family. At the

---

[3] We note that this is another reference by the *Keystone* Court to the con-
tinued vitality of the *Pennsylvania Coal* test.

time Lucas invested in these lots, his reasonable expectations were that he would proceed with these plans. However, according, to the testimony of Lucas' appraiser, the Act's prohibition against the erection of any habitable structure caused the value of the lots to plummet to zero. The lots now lack fair market value and there is no economically viable use. Although the Coastal Council introduced testimony that the lots would have some value, its expert was completely unable to explain the method relied upon to arrive at this conclusion. The trial judge chose the conclusion of Lucas' expert over that of the Coastal Council's expert. This Court generally defers to the discretion of the trial judge on these matters because he is in a better position to observe the demeanor of the witnesses and pass on their credibility. Further, from my own review of the record, I find the valuation of Coastal Council's expert to have been totally speculative. Accordingly, since Lucas' land has no fair market value, I would hold that the second part of the test, deprival of economically viable use, has been met and a taking has been established.

Having determined that application of the Act constitutes a taking under the Constitution of the United States, it is not necessary to examine whether it constitutes a taking under the South Carolina Constitution.[4] The remaining question is the appropriate remedy to be afforded the property owner now that a taking has been determined. The most recent amendments to the Act, specifically, S.C. Code Ann. §§ 48-39-290(A)(6) and 48-39-290(D)(1) (Supp. 1990), provide that an applicant may request a special permit to build a structure other than an erosion control structure or device seaward of

---

[4] There are several South Carolina decisions involving takings under the compensation clause. One of the most recent cases is *Carter v. South Carolina Coastal Council*, 281 S.C. 201, 314 S.E. (2d) 327 (1984) in which we held that restrictions which disallowed a landowner from filling in wetlands did not constitute a taking. In *Carter*, this Court did not specify whether its analysis of the takings issue was pursuant to federal or state law. Regardless, I do not see *Carter* as controlling under the facts of this case particularly since we must look to federal decisions for the proper interpretations of the United States Constitution. In *Carter*, we held that every regulation "will not necessarily be a (taking) in the constitutional sense." Implicit in this is a recognition that there nonetheless will be situations where regulation will be a taking. As indicated by the analysis in this opinion, I would hold that this is one of those situations.

the baseline that is not otherwise allowed pursuant to Sections 48-39-250 through 48-39-360. If Lucas' application is denied, in the alternative, I would hold that Lucas be compensated for the loss of use of the land pursuant to the circuit court order.

Although I affirm the decision of the circuit court that a taking occurred, I would remand the matter to the Coastal Council for its decision as to whether to issue permits in view of the recent 1990 amendments to the Beachfront Management Act for construction of a habitable structure on the lots. If the Council should decline to issue such special permit, I would require that Lucas be compensated pursuant to the circuit court order.

CHANDLER, J., concurs.