T.C. Memo. 1999-210

UNITED STATES TAX COURT

WILLIAM N. KELLAHAN, JR., AND ALICE H. KELLAHAN, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22540-96.                    Filed June 23, 1999.

<u>J. Richard Cox</u>, for petitioners.

<u>James E. Gray</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined the following

deficiencies, additions to tax, and accuracy-related penalties:

|  |  | Additions to Tax and Penalties | |
| <u>Year</u> | <u>Deficiency</u> | <u>Sec. 6651(a)(1)</u> | <u>Sec. 6662(h)</u> |
| 1990 | $21,612 | $6,244 | $8,601 |
| 1992 | 40,334 | 5,547 | 5,038 |

Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, we must decide the following issues[1]: (1) The value of real property, 4.75 acres on which is located a manmade canal, that petitioners donated to the South Carolina Public Service Authority as a charitable contribution. We hold that the value is no higher than the amount determined by respondent, $5,950. (2) Whether petitioners are liable for the addition to tax pursuant to section 6651(a) for 1990. We hold that they are not. (3) Whether petitioners are liable for accuracy-related penalties in increased amounts pursuant to section 6662(h) for 1990 and 1992. We hold that they are.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate by this reference the stipulation of facts and attached exhibits. At the time of filing the petition, petitioners resided in Kingstree, South Carolina.

The real property that is the subject of the dispute in this case was acquired by G. H. Hardy in 1971 as part of a 15-acre

---

[1] At trial, petitioners sought to amend their petition to aver that certain income reported in 1992 had been reported twice. This matter will be disposed of separately.

tract of land in Clarendon County, South Carolina, near Lake Marion. Mr. Hardy's tract abutted land owned by H. F. Oliver. Mr. Oliver had dug a canal on his land. The canal was connected to Lake Marion and thus provided access to the lake. Mr. Oliver, who was a land surveyor, had subdivided his property and sold lots around his canal. The canal on Mr. Oliver's property terminated at Mr. Hardy's tract, and Mr. Oliver persuaded Mr. Hardy to dig a canal and subdivide in similar fashion. So Mr. Hardy arranged to have a canal (the Canal) dug on his tract, starting from the point where Mr. Oliver's canal terminated, and had Mr. Oliver survey and subdivide his tract into 28 lots surrounding the Canal. He commenced selling the lots in March 1975 and sold the last one in August 1985.

The deeds conveying the 28 lots recited the various land boundaries of each lot and further stated that each lot was bound "by waters of Lake Marion [i.e., the Canal]". The property plat showing the subdivision of Mr. Hardy's tract, which was referenced in the deeds conveying the lots as providing a "more particular description" of the lots, indicated that the lots terminated at the "high water mark" of the Canal. The plat made no reference to a low water mark or to any land between high and low water mark. When Mr. Hardy offered the lots for sale, it was his understanding that the lots extended to the center of the Canal rather than terminating at the water's edge, and he

represented this to the potential buyers.  Mr. Hardy did not specify the language used in the deeds and did not read the deeds before signing them.

The Clarendon County Assessor took the position, apparently based on the language of the deeds, that Mr. Hardy still held title to the land under the Canal waters.[2]  Consequently, sometime after Mr. Hardy had sold all the lots, he received a bill from the Clarendon County Tax Collector for property taxes owed on the Canal.  Mr. Hardy did not pay the tax on the Canal, because he did not believe he owned the Canal and because he did not think it had any value.[3]  As a result of Mr. Hardy's delinquency in paying the taxes, the Canal was auctioned by the Clarendon County Tax Collector.  Mr. Hardy subsequently had the opportunity to reacquire title to the Canal if he paid the delinquent taxes, plus a redemption fee (see below), within 12 months.  He did not do so for the same reasons he did not initially pay the property taxes on the Canal:  He did not believe he owned it, and he did not think it had any value.

---

[2] This position was later confirmed in August 1990 when, in response to a request from the Clarendon County Tax Collector, the Clarendon County Assessor issued a letter stating that, based on a review of the deeds, "the property owners abutting the canal own down to the water, but no further" and that "the developer (G. H. Hardy) still owned the land under the water."

[3] Mr. Hardy recollected that the amount billed by the Clarendon County Assessor was in the range of $2,000-3,000.

Petitioner William N. Kellahan, Jr. (petitioner) had been engaged in the purchase of properties at tax sales since the early 1980's, as a member of a partnership by the name of DAK, which consisted of W. W. Dibble, Harry R. Askins, Jr., and petitioner. DAK generated income by purchasing properties at tax sales and selling them back to the previous owners, thereby collecting redemption fees. If a property owner was delinquent in paying property taxes, the county could seize the property and sell it. The property would be sold at auction to the highest bidder, whose bid would include the delinquent taxes and penalties. The delinquent taxpayer would have 12 months in which to reacquire or "redeem" the property, by paying the delinquent taxes and penalties plus an additional fee equal to 8 percent of the bid amount. If property sold at auction was redeemed during the redemption period, the purchaser at auction would receive a refund of his bid price plus the 8-percent redemption fee; if there was no redemption, the auction purchaser would acquire title.

DAK's principal objective in engaging in the tax sale purchases was to collect the 8-percent redemption fees, which were distributed to the partners. Approximately 80 to 85 percent of the properties purchased by DAK were redeemed. Properties that were not redeemed would be distributed by DAK to the individual partners, who would attempt to sell them at a gain.

Unredeemed properties would be equally divided among Mr. Dibble, Mr. Askins, and petitioner based on the properties' bid prices. The specific properties were divided randomly, but in a manner ensuring that each partner got the same total value of properties, based on their bid prices. The partner to whom an unredeemed property was assigned would be deeded the property by the relevant county after the redemption period had expired. Often, after the properties had been deeded, it was the practice of Mr. Dibble, Mr. Askins, and petitioner to exchange properties, primarily for convenience (because, e.g., a property was closer to a partner's place of residence, or to equalize the value of parcels being exchanged). Properties exchanged between the partners were valued based on the bid prices plus any additional taxes paid during the period the property had been held.

DAK purchased the Canal at a tax sale in October of 1986 for a bid price of $100. The Canal was not redeemed and was assigned to petitioner. In October 1988, the Canal was deeded[4] from the Clarendon County Tax Collector to Colonial Properties, Inc., a corporation controlled by petitioners. Colonial Properties deeded the property to Mr. Askins in May 1989, for total consideration of $159. Mr. Askins subsequently exchanged the property with Mr. Dibble, and it was deeded to Blue, Inc., a

---

[4] This deed indicated that the taxes due for 1985, 1986, and 1987 totaled $51.39.

corporation owned by Mr. Dibble.  For purposes of the foregoing transfer, Mr. Askins and Mr. Dibble treated the property as having an exchange value of $160.  Finally, the Canal was deeded from Blue, Inc., to petitioners on December 10, 1990, for consideration of $10 and the exchange of other property.[5]  Four days later, on December 14, 1990, petitioners contributed the Canal to the South Carolina Public Service Authority (SCPSA). Petitioners contributed the Canal because the Clarendon County Tax Assessor had advised petitioner that the owners of the 28 lots surrounding the Canal were very upset that the Canal had been sold and had suggested that petitioner either attempt to work out some kind of agreement with the owners or give the property to the SCPSA.  Petitioners decided to contribute the property to the SCPSA so they would not have to deal with the disgruntled owners.

At the time they contributed it, petitioners had not visited the property and knew very little about it.  In fact, petitioners did not visit the property until approximately 1 month prior to the trial in this case.  However, petitioner received a letter dated December 14, 1990 (the date of the contribution), from Harby Moses, Jr., a licensed contractor doing business as Coastal

---

[5] The record does not indicate what property was exchanged, or its value.

Structures, which stated that the cost of digging a canal of the approximate dimensions of the Canal would be $107,134.50.

As of October 5, 1988, the tax-assessed value of the Canal was $1,000. According to a ratio study completed by the State of South Carolina, in Clarendon County during 1990 the average ratio of tax-assessed value to sales price for nonresidential, nonagricultural property was 79.4 percent.

On April 15, 1991, petitioners filed a Form 4868, Extension of Time to File U.S. Individual Income tax Return, seeking an automatic 4-month extension of time to file their 1990 Federal income tax return. The Form 4868, signed by petitioners' tax return preparer, required the taxpayer to estimate the amount of tax owed and stated that "If we later find that your estimate was not reasonable, the extension will be null and void." On the Form 4868, petitioners estimated a total tax liability of $0 for 1990. On August 15, 1991, petitioners filed a Form 2688, Application for Additional Extension of Time to File U.S. Individual Income Tax Return, seeking an additional extension of time to file their 1990 return until October 15, 1991.

Petitioners hired an appraiser to value the Canal. The appraiser's report, dated August 15, 1991, valued the Canal at $111,750. The appraisal used the cost method of valuation, under which the appraiser's estimated cost of constructing the Canal, $98,010, was included in the value of the property.

On their 1990 return, petitioners claimed a charitable contribution deduction with respect to the Canal in the amount of $71,108; they claimed the remainder--$40,642--on their 1992 Federal income tax return as a charitable contribution carryover from 1990. The Canal was described on the 1990 return as 4.7 acres of land and improvements, appraised at a fair market value of $111,750. Attached to the 1990 return was the letter from Mr. Moses estimating a $107,134.50 cost for digging a canal on 4.75 acres of land. In addition, petitioners reported adjusted gross income of $237,025 for 1990, claimed itemized deductions of $104,042 (including the charitable contribution deduction with respect to the Canal of $71,108) and exemptions of $10,250, and computed taxable income of $122,733. They reported a tax liability of $32,363 and previous withholdings of $29,676, resulting in net tax due for 1990 of $2,687.

In the notice of deficiency, respondent determined that the value of the Canal was $5,950. Included in the notice was the appraiser's report relied on by respondent in making the determination and offered by respondent at trial. In preparation for trial in this case, petitioners hired a second appraiser, who valued the Canal at $72,500, and petitioners now concede that the Canal's value was no greater than $72,500.

OPINION

I. <u>Value of the Canal</u>

   A. <u>Background</u>

Section 170(a)(1) provides: "There shall be allowed as a deduction any charitable contribution * * * payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary." Where the charitable contribution consists of property other than cash, the value of the contribution, with exceptions not relevant here, is the fair market value of the donated property at the time of contribution. See sec. 1.170A-1(c)(1), Income Tax Regs.; see also <u>Hewitt v. Commissioner</u>, 109 T.C. 258, 261 (1997), affd. 166 F.3d 332 (4th Cir. 1998). The regulations define fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs.; see also <u>Johnson v. Commissioner</u>, 85 T.C. 469, 476 (1985). Valuation is a question of fact. See, e.g., <u>Estate of Newhouse v. Commissioner</u>, 94 T.C. 193, 217 (1990). The parties agree that a deduction in the instant case is permitted and that the only issue is the fair market value of the contributed property.

B. Expert Reports

Both parties rely on expert appraisals of the Canal. Respondent's expert, Felecia Coleman (respondent's expert), considered the 4.75-acre Canal to be solely land under water. She used a comparable sales approach to value the Canal, under which she attempted to estimate the value of the Canal based on the sales prices of similar properties. Since she could find no sales of manmade canals, respondent's expert used ponds as the best available comparables. Also, because there were no sales of ponds in the vicinity close to the time of the contribution of the Canal, she estimated the value of the ponds of comparable size in the area using their assessed values for local property tax purposes. On the basis of her experience in real estate, she concluded that such assessed values were typically 80 percent of fair market value, and respondent introduced statistics supporting this ratio for nonresidential, nonagricultural real property in Clarendon County. Since the tax-assessed value for similarly sized ponds in the area was $1,000 per acre, respondent's expert used a figure of $1,250 per acre as the estimated fair market value of the ponds. On the basis of that figure, she estimated the Canal's value at $5,937.50 (4.75 acres times $1,250), which she rounded to $5,950.

Petitioners' expert, Theodore B. Gardner (petitioners' expert), treated the 4.75-acre Canal as comprising three

components: 3.5 acres of land under water; a 1.25-acre strip of land between the water's edge at its normal levels and the high water mark; and 12 piers built from adjacent lots out into the water. The 1.25-acre strip of land was usually above water but was nonetheless part of the Canal parcel because the Canal extended to the high water mark. Petitioners' expert testified that the State maintained and operated a dam that, among other things, controlled the water level of Lake Marion and, in general, kept the water level below the high water mark.

With respect to the 3.5 acres of land under water, petitioners' expert's method of valuation was similar to respondent's: He too sought comparable properties and settled on ponds. He examined sales of farms with ponds of 3 acres or more. The first of these sales took place in March 1995, more than 4 years after the charitable contribution in the instant case. Petitioners' expert relied on buyers' estimates of the per-acre value of the ponds, and from this he estimated the value of the land under water in the Canal to be $2,750 per acre. He thus valued the land under water at $9,625 (3.5 acres x $2,750).

With respect to the piers, petitioners' expert estimated that there were 12 piers extending out into the Canal. He valued the piers at their estimated cost of $650 each, a figure he obtained from tax assessor records. He included a total value for the piers in the amount of $7,800 (12 piers x $650).

With respect to the 1.25-acre strip of land above water, petitioners' expert estimated the size of the strip based on a visit to the Canal and examination of tax assessor maps. He valued the strip of land as follows: He measured the total waterfront footage of all lots on the Canal at 3,650 feet. He then summed the total sales prices of all the lots between March 1975 and December 10, 1990, which produced a figure of $368,900. He then divided the latter by the former to establish an average cost per waterfront foot of $101.07. He then discounted this number by 85 percent, producing a value of $15.16 per waterfront foot, or $55,334 for the strip (3,650 feet x $15.16).

The value of the Canal, therefore, under petitioners' expert's computations, was the sum of the value of the piers ($7,800), the value of the land under water ($9,625), and the value of the strip of land above water ($55,334), for a total of $72,759, which he rounded down to $72,500.

C. Court's Analysis

Valuing this parcel of property was no doubt a challenge for both experts in this case, given its highly unusual, if not unique, characteristics. Nonetheless, the Court's review of both experts' theories reveals that they cannot hold water.

We start with the use of ponds as comparables. Although we appreciate the dilemma faced by the experts, we do not accept the premise that a pond is comparable to the Canal. The owner of a

pond may restrict access.  Both petitioners' and respondent's experts agreed that the owner of the Canal could not restrict access by the public via Lake Marion.[6]  The experts' position appears correct.  See, e.g., <u>Hughes v. Nelson</u>, 399 S.E.2d 24 (S.C. Ct. App. 1990) (manmade canal opening into navigable water is itself navigable and hence open to public access).  Petitioners have in any event failed to offer facts or law to refute it.  Nevertheless, while both experts conclude that the Canal is open to public access, they fail to take this factor into account in deciding that ponds are viable comparables to the Canal for valuation purposes.  In our view, given that he cannot control public access, the Canal owner's property rights are substantially attenuated in comparison to the owner of a pond.  Cf. <u>State v. Head</u>, 498 S.E.2d 389 (S.C. Ct. App. 1997) (conviction for fishing without permission overturned; owner of land under navigable water could not prevent public access).  For this reason, we doubt that ponds and publicly accessible canals

---

[6] Petitioners attempt, unsuccessfully in our view, to refute this point on brief with the naked claim that "The record states that the Canal was dug and then opened into the waters of Lake Marion without Public Service Authority permission.  In light of that, the Public Service Authority or other interested party may well have been authorized to place a barrier between the Canal and Lake Marion."  Petitioners do not suggest who that "other interested party" might be, or provide any support for their contention.  Nor do they explain how the Canal's being subject to barricading by the Public Service Authority might enhance its value.

are comparable. In any event, the failure of either expert to address this issue renders their conclusions unreliable to the extent they involve pond comparables.

We believe there are additional substantial flaws in petitioners' expert's report. First, petitioners' expert decided to include an estimated value of $7,800 for several piers constructed by the lot owners and extending from their lots into the water of the Canal. An obvious premise underlying this position is that the Canal owner owned the piers. Yet neither the expert nor petitioners on brief offer any support for that legal conclusion or, indeed, even discuss it. In his report, petitioners' expert notes that he obtained the value he used for the piers from the tax assessor's office, which at least suggests that for local property tax purposes the piers were not considered to be part of the Canal parcel.[7] There is certainly support for the contrary conclusion; namely, that the piers were the property of the lot owners. See, e.g., <u>Sea Cabin On the Ocean IV Homeowners Association v. City of North Myrtle Beach</u>, 828 F. Supp. 1241 (D.S.C. 1993) (pier held to be an appurtenance to the real property located above the mean high water mark). In any event, on this record, petitioners have failed to show that

---

[7] The tax-assessed value attributed to the Canal by the Clarendon County Assessor in October 1988 was $1,000, whereas the value placed on the 12 piers was approximately $650 each, according to petitioners' expert.

the value of the piers should be counted in determining a value for the Canal.

Second, petitioners' expert's method of valuing the strip of land between the ordinary water level and the high water mark of the Canal is flawed. It appears that the figure used for the total sales prices of all 28 lots, $368,900, included multiple sales of the same lots. This would skew the average.[8] Further, petitioners' expert provided no convincing rationale for his determination that the value of the strip of land could be determined by taking 15 percent of the combined fair market values of the 28 lots and allocating it to the amount of their waterfront footage. Thus, his use of the 85-percent discount appears to be arbitrary. We accordingly reject this portion of his analysis.

The most significant problem with the valuation of petitioners and their expert is the proposition that the strip of land between the water's edge and high water mark of the Canal had significant value at all. Petitioners' expert valued the strip at $55,334. However, petitioners' expert conceded that the strip, which he estimated varied in width from 7 to 15 feet, and

---

[8] For instance, if each of the lots were sold twice, then the total sales prices would have been with respect to twice the waterfront footage, which would mean (other things being equal) that each waterfront foot was half as valuable as petitioners' expert calculates.

was by definition occasionally submerged, could not be used for residential or agricultural purposes. Petitioners' expert also conceded that the strip was only accessible to its owner by water, and, further, that the only conceivable market for the property would be the 28 adjacent lot owners. Petitioners make clear in their arguments on brief that their theory of valuation is that the strip of land between the water's edge and high water mark was valuable because it afforded its owner the opportunity to restrict the water access of the 28 adjacent lot owners. Thus it was a nuisance that the lot owners would pay to eliminate. Respondent counters that, under South Carolina law, the lot owners had an easement granting them access to the water, citing McAllister v. Smiley, 389 S.E.2d 857 (S.C. 1990) (owner of lot bounded by road had easement over road since it appeared in original plat). Thus, respondent argues, the lot owners would pay nothing for water access or would certainly sue any owner of the strip who sought to restrict their water access. We believe there is significant support for respondent's position. In addition to the case cited by respondent, we note Epps v. Freeman, 200 S.E.2d 235 (S.C. 1973), which held that where waterfront property is subdivided such that a strip of land exists between the lots and the water, the lot owners have a right to water access if it was the "intention of the subdividers" to give the lot owners access to the water and "the

plat amounted to a representation" that the lot owners would have access to the water. Id. at 242. The record in this case demonstrates that the subdivider's intent was to give water access, and the plat, or at least Mr. Hardy's representation to buyers, appears to indicate water access. Further, the record in this case amply documents that the 28 lot owners were "very disgruntled" upon learning that the Canal had been sold at auction for back taxes.

We need not, and do not, decide whether under South Carolina law the adjacent lot owners had easements with respect to the Canal parcel. It is sufficient for our purposes to conclude that there was a significant risk that such was the case. We believe it obvious that whatever property rights were conveyed with ownership of the Canal parcel were subject to significant litigation hazards. We conclude that it was a virtual certainty that any attempt by the Canal's owner to restrict the adjacent lot owners' water access would be met with a lawsuit.[9] Petitioners' expert conceded at trial that he took no account of the possibility of litigation in arriving at his value estimate. This fact alone might provide grounds for substantially discounting his conclusions. When we consider the failure to

---

[9] Indeed, given the lot owners' disquietude evidenced in the record, we believe merely holding title to the Canal might result in entanglement in a suit to quiet title brought by the lot owners.

account for litigation hazards along with the shortcomings previously discussed, we conclude that petitioners' expert's conclusions should be disregarded.

Having largely rejected[10] both expert reports, we must ascertain the value of the Canal based on the remaining evidence in the record. With respect to the multiple transfers of the Canal between the DAK partners, respondent's expert conceded that they were not at arm's length, and for that reason we believe they should be disregarded. Likewise, with respect to the tax sale for $100, there is no evidence in the record that the auction was publicized or otherwise reached a wide market. We therefore conclude that it was more akin to a "forced" sale and should be disregarded. Mr. Hardy abandoned the property rather than pay the accumulated tax liability, which he recalled was between $2,000 and $3,000.[11] Mr. Hardy was highly knowledgeable regarding the Canal, and we believe his actions have some probative value with respect to its worth. In addition, there is no evidence that the value of the Canal changed significantly between the time of Mr. Hardy's abandonment and the later

---

[10] We accept respondent's expert's contention in her report that the tax-assessed value of the subject property "cannot be ignored as an indication of value".

[11] The deed resulting from the tax sale indicated that the taxes due for 1985 through 1987 totaled only $51.39.

contribution by petitioners. Cf. Estate of Spruill v. Commissioner, 88 T.C. 1197, 1233 (1987).

There remains the assessed value for local property tax purposes of $1,000. The tax-assessed value of property is, in general, "'not * * * necessarily a reliable criterion to be used in estimating its fair market value'", Frazee v. Commissioner, 98 T.C. 554, 563 (1992) (quoting Estate of Lippincott v. Commissioner, 27 B.T.A. 735, 740 (1933)). This is particularly true when there is nothing in the record indicating that the tax-assessed value was intended to represent fair market value. See Frazee v. Commissioner, supra. However, in this case the record contains evidence that the tax-assessed value of property in this locality was approximately 80 percent of fair market value. The ratio study conducted by the State of South Carolina found that in 1990 the average ratio of tax-assessed value to sales price for nonresidential, nonagricultural property in Clarendon County was 79.4 percent. Respondent's expert also opined that the tax-assessed value of property in South Carolina was approximately 80 percent of fair market value. Moreover, in appropriate circumstances tax-assessed values can be useful as a guideline or as corroboration of other evidence of fair market value. See Fannon v. Commissioner, T.C. Memo. 1986-572, modified and remanded without published opinion 842 F.2d 1290 (4th Cir.

1988).[12]  In the circumstances of this case, we believe the tax-assessed value is entitled to some weight in valuing the Canal.

Mr. Hardy's abandonment and the tax-assessed value considered cumulatively both suggest that the value of the Canal is much closer to respondent's estimate of $5,950 than to petitioners' estimate of $72,500.  Moreover, a closer look at petitioners' theory of a "nuisance" value also provides support for respondent's position.  Petitioners theorize that the Canal had value because the 28 adjacent lot owners would "pay something" to eliminate a potential obstacle to their water access.  As noted earlier, the respective property rights of the adjacent lot owners and the Canal owner were not clear and would likely require litigation to determine.  The parties to such a potential dispute might well pay to avoid it.  Under petitioner's theory of value, the 28 lot owners would collectively pay $72,500, or almost $2,600 each, to be rid of the nuisance.  The average purchase price of the lots was approximately $10,370.[13] We do not believe, given the speculative nature of the Canal owner's rights to restrict their water access, that the lot

_____

[12] As we pointed out in Fannon v. Commissioner, T.C. Memo. 1989-136, the Court of Appeals for the Fourth Circuit also relied on assessed values in reaching its result.

[13] This price is based on the sales data provided in petitioners' expert's report, using only the most recent sale for lots that had been sold more than once.

owners would be likely to pay anywhere near this amount, which represents approximately 25 percent of the average purchase price of the lots. Under respondent's value, the lot owners would collectively pay $5,950, or a little more than $200 each. This, we believe, represents a more realistic estimate of the nuisance value of the Canal owner's speculative property rights.

The Canal parcel only came into existence as a result of inadvertence. Any owner of the Canal could not restrict public access to the Canal waters from Lake Marion. As to a Canal owner's right to restrict the adjacent lot owners' water access from their lots, the record amply demonstrates that any such nuisance value was speculative and subject to a significant litigation hazard. The Canal's first owner abandoned it, and petitioners gave it away, rather than confront the litigation almost certainly entailed in any effort to realize value from the property rights conferred by Canal ownership. Based on our review of all the evidence with respect to the Canal, we conclude that respondent's determination of a value of $5,950 is better supported than petitioners' and that petitioners have failed to prove that the value was any greater than the amount conceded by respondent. Accordingly, we sustain respondent's determination of value.

II.  Addition to Tax

In the notice of deficiency, respondent determined that petitioners were liable for additions to tax under section 6651(a) for failure to file tax returns for both 1990 and 1992. Respondent now concedes that petitioners are not liable for the addition to tax for 1992.  Respondent agrees that the requests for extension for filing the 1990 return were timely filed and that petitioners' 1990 return was filed within the time as provided in the requests for extension.  However, respondent argues that the Form 4868, requesting an automatic extension of time to file, was invalid.  We disagree.

In order for a Form 4868 to be valid, the taxpayer must use available evidence of tax liability, and must attempt to locate evidence, to make a proper estimate.[14]  See Crocker v. Commissioner, 92 T.C. 899 (1989).  The mere fact that the estimate is incorrect does not make the Form 4868 invalid.  See id. at 906-907.  However, "if a taxpayer, in his Form 4868 request for automatic extension, estimated his tax liability to be zero, even though he had, at the time he submitted the request, ample evidence discrediting the estimate, the Form 4868 would be invalid."  Id. at 908.

---

[14] The Form 4868 itself warns of this limitation.  It states:  "If we later find that your estimate was not reasonable, the extension will be null and void."

In this case, petitioners did not have "ample evidence discrediting the estimate" of zero tax liability and in fact had some evidence supporting it.  Petitioner received a letter from a licensed contractor prior to filing the Form 4868, which stated that the cost of constructing a canal similar to the Canal would be $107,134.50.  Given that a copy of this letter was ultimately attached to their tax return as filed, we believe petitioners estimated the value of their contribution of the Canal using replacement cost.  Petitioners thus made an effort to locate evidence which, although incorrectly used, was sufficient for purposes of their Form 4868 estimate, particularly in light of the fact that valuing this property involved complicated legal issues and posed a genuine challenge for both experts who testified in this case.  Accordingly, petitioners are not liable for the addition to tax under section 6651(a) for 1990.

III.  Accuracy-Related Penalties

In the notice of deficiency, respondent determined that petitioners were liable for accuracy-related penalties under section 6662(h) for both 1990 and 1992.  Section 6662(h) applies when there is a substantial valuation overstatement in which the value of any property claimed on a tax return is 400 percent or more of the value determined to be correct.  See sec. 6662(h)(2)(A), (e)(1).  However, no penalty is imposed unless the portion of the underpayment attributable to substantial valuation

overstatement exceeds $5,000.  See sec. 6662(e)(2).  If section 6662(h) applies, the accuracy-related penalty under section 6662(a) is applied using a 40-percent, rather than a 20-percent, rate.  See sec. 6662(h)(1).  In this case, the value of the Canal claimed on petitioners' tax return, $111,750, is 400 percent or more of the value determined to be correct, $5,950.  Further, the portion of the underpayment attributable to substantial valuation overstatement exceeds $5,000.  Thus, section 6662(h) applies.  However, petitioners might be relieved of the penalty under section 6662(h) if section 6664(c), the reasonable cause exception, applies.

Section 6664(c) provides in relevant part as follows:

(1)  In general.--No penalty shall be imposed under this part with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion.

(2)  Special rule for certain valuation overstatements.--In the case of any underpayment attributable to a substantial or gross valuation overstatement under chapter 1 with respect to charitable deduction property, paragraph (1) shall not apply unless--

(A) the claimed value of the property was based on a qualified appraisal made by a qualified appraiser, and

(B) in addition to obtaining such appraisal, the taxpayer made a good faith investigation of the value of the contributed property.

By adding subparagraph (B) to section 6664(c)(2), Congress obviously intended that the taxpayer take some further steps beyond merely obtaining an appraisal from a qualified appraiser. We believe that petitioners' actions in this case fall short of what subparagraph (B) requires. Petitioner had experience in real estate, given his activity in purchasing property at tax sales and reselling it, and successfully ran his own engineering and survey business. Thus he is chargeable with some sophistication in real estate matters. Taking into account petitioner's experience, and the fact that he did not even visit the property until approximately 1 month before trial, we conclude that he failed to make a "good faith investigation" of the value of the contributed property within the meaning of section 6664(c)(2)(B) before claiming the value on the tax return. See Sergeant v. Commissioner, T.C. Memo. 1998-265. Therefore, petitioners have failed to satisfy section 6664(c)(2)(B), and the reasonable cause exception does not apply. Accordingly, petitioners are liable for the accuracy-related penalty under section 6662(h) for 1990 and 1992 as determined by respondent.

An appropriate order will be issued.